IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
ENTERED

SEP 2 7 2006

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| PREMIERE HOLDINGS OF TEXAS LP., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| versus | § | CIVIL ACTION NO.  H-04-0916 |
| | § | |
| STERLING REIT, INC., ET AL., | § | |
| | § | |
| Defendants. | § | |

## O R D E R

Pending before the Court is Defendant Thomas Mathew's Motion for Summary Judgment.
**(Instrument No. 36)**.

### I.

On June 23, 2005, this Court issued an Order withdrawing the reference as to this adversary
proceeding, which was originally filed in the United States Bankruptcy Court for the Southern
District of Texas, Houston Division (Case No. 03-3948) pursuant to 28 U.S.C. § 157 and § 1334.[1]
(Instrument No. 8). Venue is proper in this district pursuant to 28 U.S.C. § 1409. On September 15,
2005, Premiere Holdings of Texas, LP Liquidating Trust ("Plaintiff" or "Premiere")[2] filed its Second
Amended Complaint against Defendants Sterling REIT, Inc. ("Sterling") and Thomas Mathew
("Mathew") alleging dishonor of a promissory note, breach of contract, fraud, and conspiracy relating

---

[1] This case is a core proceeding to the bankruptcy case styled *In re Premiere Holdings of Texas, LP*, Case No.
01-40836-H2-11.

[2] The Premiere Trust was established under the Chapter 11 Trustee's Third Amended Joint Consolidated Plan
of Liquidation under Chapter 11 of the Bankruptcy Code, confirmed in the Premiere Holdings of Texas, LP; MMCOA,
LP; and Lapin & Wigginton Funding LP bankruptcy cases.

to an exit fee for broker services allegedly rendered in relation to a loan made to Defendants. (Instrument No. 20, at 3-4). Plaintiff is seeking actual damages as well as exemplary damages, attorneys' fees, and pre- and post-judgment interest. (*Id.*, at 4-5).

In 2001, Mathew and Sterling made a business decision to purchase the remainder of the ownership interests in the Fixed Based Operations ("FBO's") in which Mathew was already part owner. (Instrument No. 36, at 2). FBO's are "private airports" of sorts that provide hangar, fueling, and other services at airports. (*Id.*). The purchase of the ownership interests would allow Sterling and Mathew to become the sole owners of the FBO's. (*Id.*). Considering the time restraints to close this deal, and after having considered more traditional lending institutions (e.g., Wells Fargo Bank) that could not produce the amount of loan money necessary in such a short amount of time, Sterling and Mathew chose Money Mortgage, Ltd. ("Mortgage" or "Money Mortgage") (a division of Premiere) to underwrite the loan. (*Id.*). Lucky Srinivasan ("Lucky"), an agent and consultant of Sterling, contacted Mortgage to initiate the loan for the FBO's in the amount of $5,000,000 at a 15% interest for a term of 12 months ("the Waterfront Note"). (*Id.*).  Once the loan process was initiated, Mortgage gave Lucky loan documents to be signed by Sterling and Mathew. The documents included the following: Mortgage Loan Application: Equity Loan (the general application); the Disclosures Regarding Mortgage Transaction: Equity Loan (document purporting to establish a broker relationship and basis for broker fees); the Waterfront Note; and the Exit Note (a promissory note in the amount of $500,000). (*Id.*).

On August 9, 2001, Mathew signed all of the documents related to the loan, and the loan was closed and funded on that same day. (*Id.*, at 1). As part of the closing, Mathew and Sterling paid Mortgage a $750,000 broker's fee as part of the loan agreement. (*Id.*). The Exit Note, which stated

that an exit fee in the amount of $250,000 would be payable to Mortgage if the Waterfront Note was

paid on or before six months before the due date, or $500,000 if the loan was paid off after six

months after closing. The Exit Note also stated that "[a]ll exit fees shall be payable upon payoff of

the loan." (*Id.*, at Exhibit 2). The Note also includes the following clause:

> By your signature below Borrower agrees (1) the loan fees and exit fees are paid as
> broker compensation in consideration for arranging this loan; (2) the loan and exit
> fees are reasonable and voluntarily paid by Borrower; (3) the lender will receive none
> of the loan fees and exit fees; (4) the loan fees and exit fees are not paid to Broker for
> the use or forbearance of money; (5) Money Mortgage, Ltd. and its affiliates will not
> fund any of the loan amount; (6) it has rights under Texas Usury Law and specifically
> renounces its right to bring a usury claim arising out of this Mortgage Loan
> Application and any loan made as a direct result of this Mortgage Loan Application;
> and (7) Borrower specifically agrees that absent his express and effective waiver of
> any possible usury claim, Money Mortgage, Ltd. would not arrange for and its
> investors would not extend credit under this Mortgage Loan Application.

(*Id.*). The $5,000,000 Waterfront Note was paid in full in February 2003 after a settlement was

reached in a suit commenced by Mathew against Waterfront. (Instrument No. 38, at 2). Mathew,

however, did not at that time pay the Exit Note, despite Plaintiff's demand letter dated February 13,

2003, per Lucky's advice. (Instrument No. 36, at 4; Instrument No. 38, Exhibit C). Mathew states

that he did in fact have the money to pay Mortgage the $500,000 Exit Note fee, but because

Mortgage never requested payment of the fee, Mathew never tendered the money--despite his

contention that he believed he was legally obligated to pay the additional fee. (Instrument No. 36, at

4-5).

Plaintiff states that both Mortgage and Lapin were divisions within Premiere as well as

assumed names of Premiere. (*Id.*, at 4). Plaintiff argues that Lapin, while affiliated with Premiere, was

a separate and distinct entity. (*Id.*, at 5). Defendant argues that Mortgage and Lapin were both

wholly-owned subsidiaries of Premiere where all were housed in the same office under one lease, all of their employees' paychecks came from Premiere, and all were a part of an operation controlled by Premiere. (Instrument No. 36, at 3). As for Waterfront Mortgage, L.P. ("Waterfront" or "Waterfront Mortgage") (the company to which the principal amount of the loan was due), Defendant believes the entity to be no more than a "paper company." (*Id.*, at 4). Plaintiff states that just a short time before Sterling and Mathew's loan was closed, either Premiere or its affiliates filed a Certificate of Limited Partnership for Waterfront with the Texas Secretary of State. (*Id.*). Waterfront's general partner was listed as Lapin & Wigginton, Ltd., but Defendant asserts that there is no evidence that Waterfront had any employees, officers, bank accounts, or assets (besides it being named as payee on Mathew's Waterfront note). Further, Defendant contends that there is no evidence that Waterfront received funds from investors in the general public to fund the loan to Mathew and Sterling. (*Id.*). The $500,000 exit fee remains unpaid and is the focus of this adversary proceeding that was removed from the Bankruptcy Court. (Instrument No. 1). On the other hand, Plaintiff states that its summary judgment evidence demonstrates that Waterfront did have limited partners who funded the Mathew and Sterling loan, and the facts that Waterfront continued on as a limited partnership even after the bankruptcy of Premiere and that Mathew and Sterling settled with Waterfront on the loan amount, contradict Defendant's position that Waterfront was a "paper company." (Instrument No. 38, at 5).

Prior to the closing, Defendant Mathew avers that he had no contact or communication of any kind with Mortgage, Lapin, or any other "Premiere entity." (Instrument No. 36, at 4). After the closing, Mathew states that he had a brief conversation with Mr. Kaminski, a purported limited partner in Waterfront. (*Id.*). In early 2004, Richard Kammerman ("Kammerman") was retained as counsel for Sterling and Mathew. (*Id.*, at 5). In November 2005, this Court granted Kammerman's

4

motion to withdraw as Sterling's counsel, and as a result, Sterling was ordered to retain new counsel. (*Id.*). By January 2006, Sterling had not yet retained new counsel in this case, and this Court granted Plaintiff's Motion for Default Judgment against Sterling and issued a Default Judgment. (*Id.*).

Plaintiff Premiere's corporate structure chart shows that Mortgage and Lapin & Wigginton, Ltd. ("Lapin") conduct two separate functions in the processing of a loan–the chart states that Mortgage is responsible for mortgage operations, while Lapin is responsible for funding operations. (Instrument No. 38, at Exhibit E). More specifically, Lapin was responsible for raising cash from the general public to fund loans–charging 12% interest on amounts invested with Lapin; and Mortgage was responsible for originating, underwriting, negotiating, approving, funding, and servicing the loans. (Instrument No. 36, at 3).

On April 10, 2006, Defendant Mathew filed this Motion for Summary Judgment. (Instrument No. 36).  Defendant argues that the Exit Note is unconscionable, fraudulent, and violative of the usury laws of Texas. (*Id.*, at 7). More specifically, Defendant argues that Plaintiff's claims of fraud and conspiracy fail as a matter of law because there were never any communications made by Mathew to Mortgage, Lapin, Premiere, Waterfront, or any of the other Premiere-related entities. (*Id.*, at 8). Further, Defendant argues that because no broker services were rendered by Mortgage to him or Sterling, no consideration was given in exchange for the Exit Note, and therefore, the Note violates general principles of contract law. (*Id.*, at 9). Also, Defendant believes that the broker fees charged by Mortgage are unconscionable, as the total amount of fees equaled $1,250,000 ($750,000 at closing plus $500,000 upon payment of the principal). (*Id.*, at 11-15). Defendant also asserts a usury defense because he believes that if the Court determines consideration was given for the Exit Note, the broker fees charged to Mathew and Sterling is actually disguised interest on the $5,000,000 loan. (*Id.*, at 15-

5

18). Finally, Defendant raises the defense of fraud because he argues that Plaintiff perpetrated a fraud on him by making misrepresentations to him about material facts regarding the loan. (*Id.*, at 18-19).

On May 1, 2006, Plaintiff Premiere filed its Response to Defendant Mathew's Motion for Summary Judgment. (Instrument No. 38). First, Plaintiff objects to affidavits attached to Defendant's Motion for Summary Judgment because (1) Plaintiff alleges that much of Mathew's affidavit is based on hearsay and contains conclusory statements, and (2) Plaintiff alleges that Jeffrey Dunn's affidavit should be stricken because Mr. Dunn has no personal knowledge of the matters in this case. (*Id.*, at iv). Plaintiff contends that Defendant's defenses of fraud and conspiracy fail because Defendant Mathew did in fact sign the loan documents, and as a result, made representations that he would pay the exit fee upon the repayment of the loan. (*Id.*, at iv-v). Moreover, Plaintiff states that there is ample evidence to demonstrate that consideration was given for the Exit Note because Mathew has testified that he received exactly what he wanted and that he was able to close on his transaction. (*Id.*, at v). Further, Plaintiff avers that because Mathew knew of all the fees and terms of the agreement, and signed the loan documents in his own home, the Exit Note cannot constitute an unconscionable contract. (*Id.*). Premiere next argues that the Exit Note is not usurious on its face, and that Defendant cannot assert this defense because of the savings clause in the Exit Note. (*Id.*, at v-vi). Lastly, Premiere contends that Mathew's affirmative defense of fraud fails because nothing was ever misrepresented to him, and he cannot show any damages. (*Id.*, at vi).

## II.

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A fact is "material" if its

resolution in favor of one party might affect the outcome of the suit under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also United States v. Arron*, 954 F.2d 249, 251 (5th Cir. 1992).  An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.  *See Anderson*, 477 U.S. at 248.  If the evidence rebutting the motion for summary judgment is only colorable or is not significantly probative, summary judgment should be granted.  *See id.* at 2511; *see also Thomas v. Barton Lodge, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999).  The summary judgment procedure, therefore, enables a party "who believes there is no genuine issue as to a specific fact essential to the other side's case to demand at least one sworn averment of that [specific] fact before the lengthy process continues." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886-88 (1990).

Under Rule 56(c), the moving party bears the initial burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial and of identifying those portions of the record that demonstrate such absence.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 576, 586-87 (1986); *see also Burge v. Parish of St. Tammany*, 187 F.3d 452, 464 (5th Cir. 1999).

Where the moving party has met its Rule 56(c) burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 586-87 (quoting FED. R. CIV. P. 56(e)) (emphasis in original). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Engstrom v. First Nat'l Bank*, 47 F.3d 1459, 1462 (5th Cir. 1995).  To sustain the burden, the nonmoving party must produce evidence admissible at trial.  *See Anderson*, 477 U.S. at 242; *see also Thomas v. Price*,

7

975 F.2d 231, 235 (5th Cir. 1992) ("To avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue.").

The Court reviews the facts in the light most favorable to the nonmovant and draws all reasonable inferences in favor of the nonmovant. *See Brown v. Bunge Corp.*, 207 F.3d 776, 781 (5th Cir. 2000). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

### III.
### A.

Defendant argues that no conspiracy existed to commit fraud because there was little to no communication among Defendant and Plaintiff, Mortgage, Waterfront, and any of the other Premiere-related entities. (Instrument No. 36, at 8). To prove a *prima facie* case of common-law fraud, the Plaintiff must show that: (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the other party; (5) the party acted in reliance upon the representation; and (6) the party suffered injury. *Johnson & Higgins v. Kenneco Energy*, 962 S.W.2d 507 (Tex. 1998). A promise to do something in the future is not fraud unless the promise was made with the intent not to perform. *M.J. Sheridan & Sons Co. v. Seminole Pipeline Co.*, 731 S.W.2d 620, 624 (Tex.App.-Houston [1st Dist.] 1997, no writ). Plaintiff argues that Defendant and Sterling committed fraud in a conspiracy against it because by signing the loan documents, which included the Exit Note,

Defendant represented to Plaintiff that he would pay the exit fee ($500,000) in conjunction with the loan from Mortgage, but has not paid such fee. (Instrument No. 1, at 4).

## 1.

Circumstantial evidence, including the subsequent conduct of the promisor, may be used to prove intent not to perform a promise at the time it was made. *Pulchny v. Pulchny*, 555 S.W.2d 543, 545 (Tex.Civ.App.-Corpus Christi 1977, no writ). "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony" *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986); and therefore, "[s]ummary judgment is rarely proper." *Taylor v. Bonilla*, 801 S.W.2d 553, 557 (Tex.App.1990, writ denied). By itself, the failure to perform does not establish fraudulent intent; however, "[s]light circumstantial evidence of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent." *Spoljaric*, 708 S.W.2d at 435 (internal quotations omitted).

Here, it is clear from the record that Mathew signed all of the loan documents, on his own volition, including the Exit Note, which required him to pay an additional $500,000 when the principal amount of the loan was paid off at a certain time. While this is true, evidence in the summary judgment record also indicates that Mathew's verbal communication with Plaintiff Premiere, Waterfront, or any of the Premiere-related entities was virtually non-existent. Mathew does state that at the time he signed the Exit Note, he intended to pay the amount in full upon the repayment of the entire loan balance, which, if true, would negate the majority of the elements of Plaintiff's fraud and conspiracy claims. Further, Mathew states that he would have paid the Exit Note in February

2003, at which time he said he was acting without counsel, if he had received such a request from Premiere. Plaintiff counters Mathew's statement by providing evidence to the Court that in February 2003 Mathew was in fact represented by counsel, and also that a letter dated February 13, 2003 entitled "Notice of Intention to Accelerate and Demand for Payment" was sent to both Mathew and Sterling demanding payment of the Exit Note. (Instrument No. 38, at Exhibit C).

In viewing the evidence in the light most favorable to the Plaintiff, this evidence; specifically, Defendant's statement that the reason the Exit Note was never paid was in part due to the fact that he never received a request for payment of the Exit Note even when Plaintiff has produced evidence to the contrary, creates a material fact issue with respect to Mathew's intent to pay the Exit Note at the time he signed the agreement with Money Mortgage.

## 2.

In order to prove a case of fraud, the Plaintiff must show that Defendant possessed the requisite intent to defraud Plaintiff and that Plaintiff Premiere both justifiably and actually relied on Defendant's promise to pay the Exit Loan. *Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1025 (5th Cir. 1990). Defendant Mathew highlights that David Lapin (Chief Operating Office of Premiere) stated in his deposition that he was not made aware of any misrepresentations or the like by Mathew to Premiere or any other Premiere-related entity regarding the payment of the Exit Note or the loan. (Instrument No. 36, at 8). Plaintiff attempts to refute this evidence by stating that the deposition testimony of Richard Melamed ("Melamed")(real estate attorney for Premiere) and Ted Murray ("Murray")(principal of Premiere) provide proof that both of these Premiere representatives believe that Premiere relied on promises made by Mathew and Sterling, and that if Mathew or Sterling

10

signed the Exit Note without intending to pay it, it would be misrepresentation. (Instrument No. 38, at 6).

To make a determination about justifiable reliance, the court must consider whether, "given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud–it is extremely unlikely that there is actual reliance on the plaintiff's part." *Id.*, at 1026; *see also General Motors Corp., Pontiac Motor Div. v. Courtesy Pontiac, Inc.*, 538 S.W.2d 3, 6 (Tex.Civ.App.-Tyler 1976, no writ) (quoted in *Haralson*, 919 F.2d at 1026) (internal quotations omitted). In other words, a plaintiff cannot justifiably rely on "representations which any [person] would recognize at once as proposterous . . . or which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth." *Courtesy Pontiac, Inc.*, 538 S.W.2d at 6.

Mathew maintains that because he had little to no communication with Premiere, Money Mortgage, or any other Premiere-related entities, the Court cannot presume that any of these entities acted in reliance on or suffered any injury as a result of alleged representations made by him. (Instrument No. 36, at 9). Further, Mathew states that "[m]erely refusing to pay a note or any debt when one has good reason to do so is not fraud or any civil wrong." (*Id.*). The summary judgment evidence shows, however, that Mathew did in fact sign all of the loan documents–including the Exit Note, and by his signature, he acknowledged the following:

> (1) the loan fees and exit fees are paid as broker compensation in consideration for arranging this loan; (2) the loan and exit fees are reasonable and voluntarily paid by Borrower; (3) the lender will receive none of the loan fees and exit fees; (4) the loan fees and exit fees are not paid to Broker for the use or forbearance of money . . . .

11

(Instrument No. 36, Exhibit 2, at 2). Based on the deposition testimony and the loan agreement which includes Mathew's signature, and viewing the evidence in the light most favorable to the Plaintiff, the Court concludes that Plaintiff has provided sufficient evidence to establish that a fact issue exists as to whether its reliance on Mathew's signature was justifiable. Because genuine issues of material fact exist with respect to Plaintiff's claim that a conspiracy existed to commit fraud, Defendant's Motion for Summary Judgment with respect to that issue is **DENIED**.

### B.

Next, Defendant argues that because there were no broker services rendered in connection with the loan agreement signed by Defendant Mathew and Sterling, no consideration was given in exchange for the Exit Note, and as a result, the Note must be declared unenforceable and/or void. (Instrument No. 36, at 9). Plaintiff argues that deposition testimony provides support for its argument that broker services were provided by Mortgage, and that because these services were performed by Mortgage for Defendant Mathew, consideration exists to support the Exit Note. "A complete failure of consideration constitutes a defense to an action on a written agreement." *Gensco, Inc. v. Transformaciones Metalurgicias Especiales S.A.*, 666 S.W.2d 549, 553 (Tex. App.–Houston [14th Dist.] 1984, writ dism'd). "The defense of failure of consideration defeats summary judgment if the nonmovant alleges facts and presents evidence that the consideration in the agreement was not received." *Stewart v. U.S. Leasing Corp.*, 702 S.W.2d 288, 290 (Tex.App.–Houston 1985, no writ (citing *O'Shea v. Coronado Transmission Co.*, 656 S.W.2d 557, 563 (Tex.App.–Corpus Christi 1983, writ ref'd n.r.e).

The loan agreement and Exit Note were signed by Mathew at the same time. (Instrument No. 36, at 10). In addition to the $5,000,000 Waterfront Note, Mortgage assessed what it dubbed to be broker fees in the amount of $1,250,000 ($750,000 at closing; $500,000 Exit Note). Defendant has not yet paid the $500,000 Exit Note despite his paying back the principal amount of the loan in 2003. In this case, Defendant asserts that the Exit Note, valued at $500,000 was not supported by consideration (namely, broker services), and is therefore unenforceable. In both the loan application and the Disclosures and Mortgage and Equity Loan Agreement, Money Mortgage characterized the $1,250,000 fees as "broker fees." (*Id.*). Defendant states that despite this characterization, Mortgage never provided any broker services. (*Id.*). More specifically, Defendant asserts that Mortgage did not seek out additional lenders, and that it did not perform adequate due diligence to seek out the best possible deal. (*Id.*). On the other hand, Plaintiff provides deposition testimony by Melamed as evidence that Mortgage did render broker services. Specifically, Melamed's deposition indicates that Mortgage originated the loans, brokered the loans, completed transactions using others' funds, arranged the loan, qualified borrowers, evaluated the collateral, and both packaged and serviced the loan. (Instrument No. 38, at 7). Defendant contends that because L & W (a Premiere affiliate) found the investors, and in its opinion essentially brokered the loan, L&W's services cannot also suffice as services provided by Mortgage, and therefore, the Exit Note still lacks consideration. Plaintiff has provided evidence that refutes this contention, however. The Premiere Holdings Corporate Chart shows that both L & W and Money Mortgage were assumed names of Premiere, and that despite each division having separate functions, they all operated under the Premiere umbrella. (Instrument No. 38, at 8). Further, Plaintiff points to Defendant's own testimony to support its position. In Defendant's deposition, he stated that he "received exactly what he asked for" (regarding the

13

$5,000,000 loan), and that although more traditional lending institutions would have been able to structure the loan for less interest and fees, those institutions were unwilling to structure the loan in the expeditious manner which Defendant required for the purchase of FBO's. (Instrument No. 38, at 8).

In viewing the evidence in the light most favorable to the nonmovant, the Court concludes that Plaintiff has presented evidence that creates fact issues with respect to whether the Exit Note in the amount of $500,000 was supported by consideration–namely, broker services. Accordingly, Defendant's Motion for Summary Judgment with respect to the defense of lack of consideration is **DENIED**.

## C.

Defendant alleges that even if the Court decided that Mortgage provided broker services, the amount already paid and the amount to be paid as broker fees are unconscionable, and the Exit Note is unenforceable. (Instrument No. 36, at 11). Also, Defendant states the Exit Note is unconscionable because Mortgage "never shopped the deal to anyone." (*Id.*, at 11). Plaintiff argues that the Exit Note is not unconscionable, as Mathew considered many lenders before choosing Mortgage, and Mortgage was ultimately chosen because it was the only institution willing to arrange the loan in the time period required by Defendant. (Instrument No. 38, at 10).

"[T]he decision of whether some agreement is or is not unconscionable is dependent upon the existence of facts which allegedly illustrate unconscionability." *El Paso Natural Gas Co. v. Minco Oil & Gas Co.*, 964 S.W.2d 54, 61 (Tex. App.—Amarillo, 1997), *rev'd on other grounds*, 8 S.W.3d 309 (Tex. 1999). The defense of unconscionability is available to prevent unfair advantage procured

through surprise or deception. TEX.BUS. & COM.CODE ANN. § 2.302, cmt. 1. There is no precise or agreed upon definition of unconscionability, but "it must be shown that the agreement in question arose through [both] procedural and substantive abuse." *El Paso*, 964 S.W.2d at 61 (citing *Tri-Continental Leasing Corp. v. Law Office of Richard W. Burns*, 710 S.W.2d 604, 609 (Tex.App.–Houston [1st Dist.] 1985, writ ref'd n.r.e.); *Wade v. Austin*, 524 S.W.2d 79, 85 (Tex.Civ.App.–Texarkana 1975, no writ)). First, procedural abuse relates to whether oppression and unfairness tainted the negotiation process leading up to the formation of the agreement. *Pony Express Courier Corp. v. Morris*, 921 S.W.2d 817, 820 (Tex.App.–San Antonio 1996, no writ). Things such as (1) the presence of deception, overreaching, and sharp business practices; (2) the absence of a viable alternative; (3) and the relative acumen, knowledge, education, and financial ability of the parties involved all go to the determination of whether procedural unconscionability was present at the time of the negotiation of the agreement. *Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Electric Corp.*, 844 F.2d 1174, 1184 (5th Cir. 1988); *Wade*, 524 S.W.2d at 86; Restatement (Second) of Contracts § 208, cmt. d.. Second, substantive unconscionability relates more to the fairness of the contract itself. *Pony Express*, 921 S.W.2d at 821. Substantive unconscionability is best determined on a case-by-case basis, as it is not easily quantifiable, and case law and statutes vary somewhat on the definition of the term. It is well settled, however, that "when the negative aspects of the bargaining process and subsequent contract are *gross*, under the totality of the circumstances, the [] court's authority to intercede [is] triggered." *El Paso Natural Gas Co.*, 964 S.W.2d at 62 (citing Restatement (Second) of Contracts § 208, cmt. d.).

## 1.

Here, Defendant states in his motion for summary judgment that because the deadline was near for the closing of the sale of the FBO's he "had no choice but to sign [the] Loan documents." (Instrument No. 36, at 12). He further states that he did not go to another lender because there was no time, and that Mortgage knew or should have known this information. (*Id.*). Mathew's deposition testimony, however, directly contradicts these statements made in his motion for summary judgment with respect to unconscionability. He stated in his deposition that he did actually consider a number of traditional lending institutions to broker the loan, but that because none of the traditional institutions were willing to arrange the loan in the time period required, he chose to conduct business with Mortgage. (Instrument No. 38, at 10). Further, there is no evidence in the record of overreaching or sharp business practices, as Mathew was told about Mortgage through his partner Sterling REIT, Sterling was the contact person between Mathew and Mortgage, and Sterling sent the loan documents to Mathew to secure his signature on the paperwork. (*Id.*). The record demonstrates that Mathew had a strong desire to close his deal expeditiously so that he could reap the benefits of a substantial profit. "[I]f the complainant did what he did because of his own motivations, and not those of his opponent, then he must suffer the result of his deal." *El Paso Natural Gas Co.*, 964 S.W.2d at 62. The record does not show, as Defendant suggests, that he somehow forced to sign the loan documents without full knowledge of the terms of the agreement, including the terms of the Exit Note. *See Troy Mining Corp. v. Itmann Coal Co.*, 176 W.Va. 599, 346 S.E.2d 749, 754 (1986) (failing to uphold claim of unconscionability where there was a lack of evidence that indicated contract was "forced" upon the complainant); *see also Wade*, 524 S.W.2d at 86 (a person who "knowingly enters an improvident contract cannot be heard to complain thereafter).

While Defendant avoids discussing his level of familiarity with regard to deals of this nature, the record shows that Defendant's acumen or level of business sophistication with respect to these types of transactions is fairly high in that he has entered into several similar agreements in the past. (Instrument No. 38, at 18). Defendant attempts to liken this case to *Walton v. Hoover, Bax & Slovacek, L.L.P.* where it was found that a contingency fee arrangment was unconscionable as a matter of law after the issue had been submitted to the jury. 149 S.W.3d 834 (Tex.App.–El Paso 2004, pet. granted). The present case is distinguishable from *Walton* because here, the loan agreement as well as the Exit Note explicitly stated the percentage rate of interest as well as the amount of broker fees that the borrower (Mathew) would be required to pay upon acceptance of the $5,000,000 loan. In *Walton*, the court considered several factors in determining that the fee arrangement was unconscionable–namely, that the agreement did not clearly and accurately explain how the fee was to be calculated, and that the fee was not tied to the work performed or the risk incurred by the firm. *Id.*, at 846-47. Also in *Walton*, the attorneys had a distinct advantage over their clients, and tried to exploit this advantage through deception. This is not the case here. The risk involved in structuring a loan of the type that was given to Mathew is evidenced by the fact that all of the traditional lending institutions sought out by Mathew declined to arrange the loan for the amount and in the time frame necessary for Mathew to still make a substantial profit on his deal. Further, Defendant Mathew was knowledgeable about these types of deals, and was made aware of all of the terms of the agreement, but still chose to enter into the deal for his own benefit.

Therefore, the Court finds that Mathew was not subjected to procedural unconscionability because the record does not reflect that Mortgage was in any way deceptive with respect to making Mathew aware of its fee structure, Mathew solicited other traditional lending institutions and chose

Mortgage based on the fact that it was able to structure the agreement in the time period he required, and Mathew possessed the requisite acumen to either accept or reject the agreement based on the terms that were made explicitly clear to him. Accordingly, the Court finds that Mathew was not subjected to gross procedural abuse in the formation of the agreement to pay the loan and the Exit Note.

**2.**

With respect to the bargaining process, Defendant argues that "the circumstances regarding the signing of the loan were oppressive." (Instrument No. 36, at 12). This averment, however, is not supported by the facts in the record. In fact, the record indicates that Mathew had an opportunity to sign the loan documents in the comforts of his own home, and that he was sent the paperwork by his partner, Sterling REIT with no time pressure from Plaintiff. (Instrument No. 38, at 11). Also, Plaintiff notes that Mathew had legitimate commercial reasons for entering into this supposedly unconscionable agreement with Mortgage, as he wanted to make quick money on the purchase of the FBO's. (*Id.*). Texas has a strong policy in favor of freedom of contract. *Marsh v. Marsh*, 949 S.W.2d 734, 740 (Tex.App.–Houston [14th Dist.] 1997, no writ); *see also Churchhill Forge, Inc. v. Brown*, 61 S.W.3d 368, 371 (Tex. 2001). Mathew has failed to make a showing that the Exit Note was formed as the result of gross oppression, fraud, or mutual mistake, as he himself sought out Mortgage's services to assist in making his deal possible given the time constraints. *See Earman Oil Co., Inc., v. Burroughs Corp.*, 625 F.2d 1291, 1299 (5th Cir. 1980) (stating that an individual who both knowingly and "willingly" enters an agreement is not a victim of gross conduct). In considering the totality of the circumstances surrounding the formation of the Exit Note agreement, this Court

18

finds that Mathew was not subjected to substantive unconscionability. Accordingly, Defendant Mathew's Motion for Summary Judgment with respect to his defense of unconscionability fails and, therefore, is **DENIED**.

### D.

The Texas Finance Code prohibits creditors from contracting for, charging, or receiving interest in excess of the statutory limit on a loan of money. Tex. Fin. Code § 305.001. To prevail on a claim of usury, a plaintiff must show "(1) a loan of money; (2) an absolute obligation to repay the principal; and (3) the exaction of a greater compensation than allowed by law for the use of the money by the borrower." *First Bank v. Tony's Tortilla Factory, Inc.*, 877 S.W.2d 285, 287 (Tex. 1994) (citing *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex. 1982)). Generally, lenders do not expressly charge an interest rate above the legal rate. Usury occurs more often, however, when the lender charges borrowers fees that are disguised as interest that, when added to the interest rate on the face of the loan, results in the borrower paying an interest rate that is not allowable under the law. "[A]mounts charged or received in connection with a loan are not interest if they are not for the use, forbearance, or detention of money." *First USA Management Inc. v. Esmond*, 960 S.W.2d 625, 627 (Tex. 1997). To make this determination, the Texas Supreme Court has held that "fees which are an additional charge supported by a distinctly separate and additional consideration, other than the simple lending of money, are not interest and thus do not violate the usury laws." *Tony's Tortillas*, 877 S.W.2d at 287. Further, courts may look past the label given to a particular fee to discern whether the fee is a service charge or disguised interest. *Id.*

Defendant Mathew argues that the $500,000 due on the Exit Note constitutes disguised interest, making the fee usurious and the Exit Note unenforceable--despite Plaintiff's attempt to make Defendant waive any possible usury claim by including such language in the Exit Note. (Instrument No. 36, at 15). The Note reads as follows:

> By your signature below Borrower agrees (1) the loan fees and exit fees are paid as broker compensation in consideration for arranging this loan; (2) the loan and exit fees are reasonable and voluntarily paid by Borrower; (3) the lender will receive none of the loan fees and exit fees; (4) the loan fees and exit fees are not paid to Broker for the use or forbearance of money; (5) Money Mortgage, Ltd. and its affiliates will not fund any of the loan amount; (6) it has rights under Texas Usury Law and specifically renounces its right to bring a usury claim arising out of this Mortgage Loan Application and any loan made as a direct result of this Mortgage Loan Application; and (7) Borrower specifically agrees that absent his express and effective waiver of any possible usury claim, Money Mortgage, Ltd. would not arrange for and its investors would not extend credit under this Mortgage Loan Application.

Defendant requests this Court to draw a negative inference from Mortgage's inclusion of the above language in the Exit Note, as Defendant believes it logical that a company would include such language only if it realized that it was charging interest in excess of the maximum allowed under the law. (*Id.*, at 17-18).

In an effort to provide concrete support for his usury argument, Defendant relies almost exclusively on the deposition testimony of Jeff Dunn ("Dunn"), who was retained because of his expertise in this area of the law. (*Id.*, at 16). Defendant avers that because he believes no broker services were provided, the Court must construe the $500,000 Exit Note coupled with the $750,000 paid at the time the loan was finalized as additional interest on the loan. (*Id.*, at 17). Dunn testified that in his experience, a broker's fee generally ranges from 1% to 3% of the total loan amount. According to Dunn's own calculations, Defendant argues that, given the interest rate of 15% on the

$5,000,000 loan amount and the $1,250,000 in alleged broker's fees, the real amount of total interest is $2,045,256, which in his opinion, far exceeds the maximum allowable interest charge of $1,234,096 (calculated using an interest rate of 18%). (*Id.*). Plaintiff maintains, and the Court agrees, that Dunn's calculations and testimony related to whether the Exit Note is usurious do not demonstrate that the Note is in fact usurious on its face. (Instrument No. 38, at 13). "One who uses the defense of usury in a suit on a note that does not call for usurious interest on its face has the obligation to establish that there was a corrupt agreement or scheme to cover usury and that such agreement or scheme was in full contemplation of the parties." *Moss v. Metropolitan Nat'l Bank of Houston*, 533 S.W.2d 397, 399 (Tex.Civ.App.–Houston [1st Dist.] 1976, no writ). Mathew has not put forth any evidence to demonstrate that Waterfront and Money Mortgage entered into a corrupt scheme to cover usury and, therefore, he cannot prevail as a matter of law on this issue. Even further, after evaluating Dunn's testimony, the Court chooses not to rely on the calculations performed by Dunn, as there are clearly fact issues with respect to the true principal amount of the loan, (Plaintiff states the amount is $5,000,000; Defendant states the amount is $4,250,000 ($5,000,000 less the $750,000 in broker fees), the interest actually paid by Mathew, and the actual term of the loan.

The Court has also previously discussed that a fact issue exists with regard to whether Money Mortgage actually provided broker services, which would suffice as separate consideration for the broker fees assessed at the time the loan was paid, and the broker fees related to the Exit Note. The determination of this fact is critical because if it is found that no broker services were provided to Mathew, the "broker fees" included in both the Waterfront Note and the Exit Note could potentially be categorized as disguised interest, and also lead the jury to the conclusion that the broker fees coupled with the interest of 15% on the $5,000,000 Note are usurious in nature.

21

Moreover, while Mathew alleges that Money Mortgage served as the lender in the transaction, Plaintiff argues that Waterfront Mortgage, L.P. was the lender (despite Defendant's belief that Waterfront is a paper company) and that Money Mortgage was in fact the broker on the deal. (*Id.*, at 14-15). Plaintiff states that Waterfront Mortgage is not related to Premiere, and that its general partner (post-Premiere's bankruptcy) is Jefferson Advisors GP, L.L.C.. To bolster Plaintiff's argument that Waterfront Mortgage is not a paper company and that it existed on its own--wholly separate from Premiere--Plaintiff points to the Premiere Holdings Corporate Chart as well as to the fact that Waterfront Mortgage continued on as a limited partnership even after the bankruptcy of Premiere. Also, Plaintiff highlights that when Defendant Mathew paid the $5,000,000 loan, he paid Waterfront Mortgage and not Money Mortgage, which in its opinion further evidences that Waterfront Mortgage and Money Mortgage had two separate and distinct roles in the execution of the loan agreement and Exit Note with Mathew (as lender, Waterfront received payment of the principal; as broker, Money Mortgage received payment of the broker fees). (*Id.*). In viewing the evidence in the light most favorable to the non-movant, Plaintiff has presented sufficient summary judgment evidence to create a fact issue with respect to whether Waterfront Mortgage acted as simply a paper company in the Mathew transaction, or if Waterfront is a separate entity, unaffiliated with Premiere that received the payment of the principal amount of the loan.

The determination of whether the broker fees included in the Waterfront Note as well as the broker fees included in the Exit Note are usurious is rather fact intensive. *Morris v. Miglicco*, 468 S.W.2d 517, 520 (Tex.Civ.App.–Houston [14th Distr.] 1971, reh'g denied) (remanding the case to the trial court where court found that the question of the bona fides of the charge for brokerage fees is a question of fact). Defendant has not satisfied his burden of proof by demonstrating that no

genuine issues of material fact exist with respect to this affirmative defense and, therefore, the court cannot conclude that as a matter of law Defendant should prevail on this defense. Accordingly, Defendant's Motion for Summary Judgment regarding his usury claim defense is **DENIED**.

### 1.

Plaintiff contends that Defendant cannot prove a claim of usury on a receiving or charging theory because the Exit Note contains a savings clause. (Instrument No. 38, at 15). "Usury savings clauses are valid in Texas and, in appropriate circumstances, are enforced to defeat a violation of the usury laws." *Mims v. Fidelity Funding, Inc.*, 307 B.R. 849, 859 (N.D. Tex. 2002). Without assessing the validity of the savings clause contained in the Exit Note, the Court concludes that to determine properly the effect the savings clause would have on the Exit Note agreement, a determination of the fact issues discussed above with respect to Defendant's affirmative defense of usury must first be resolved. *Woodcrest Assoc., Ltd. v. Commonwealth Mtg. Corp.*, 775 S.W.2d 434, 438 (Tex.App.-Dallas 1989, writ denied).

### E.

Defendant asserts that a fraud was perpetrated on him because Mortgage represented that it would perform broker services, and Defendant contends that Mortgage did not provide him with such services. (Instrument No. 36, at 18). Defendant also believes that although the loan was funded by Mortgage, it did not "shop the loan," nor did Mortgage receive reimbursement from any money received by the public investors secured by L & W, which Defendant argues evidences Mortgage's and Premiere's "scheme [] to gain additional fees." (Instrument No. 36, at 19). Moreover, Defendant maintains that he has been damaged because Plaintiff brought a claim against him, which required him

to retain counsel to defend himself. Plaintiff argues that Defendant's affirmative defense of fraud fails because: (1) Mathew received exactly what was represented to him that he would receive; (2) Mathew was admittedly aware of the all of the terms of the Exit Note and loan agreement and chose Mortgage; and (3) Mathew also admittedly had no substantive conversations with Mortgage, and his partner Sterling sent all of the loan documentation to him. (Instrument No. 38, at 18).

Mathew's argument in support of his defense of fraud, to negate any liability he may have that stems from the Exit Note, relies heavily on the fact that Mortgage purportedly did not provide broker services as promised and set forth in the Exit Note. Because the Court has already decided above that a genuine issue of material fact exists as to whether actual broker services were indeed provided to Mathew, as stated in the language included in the Exit Note and the loan agreement, Mathew's affirmative defense of fraud fails at this juncture. Further, another fact issue exists because there is summary judgment evidence that demonstrates Mathew may not have relied to his detriment on representations made with respect to broker services, but rather that he relied on representations related to the amount of money he was to receive as part of the loan and the time frame in which the loan would be arranged and made available to him. (Instrument No. 38, at 19). Based on these conclusions, the Court finds that Defendant has failed to establish that no genuine issues of material fact exist regarding both the broker services provided and his reliance on the alleged misrepresentations. Accordingly, Defendant's Motion for Summary Judgment with respect to this issue is **DENIED**.

**IV.**

Based on the foregoing, IT IS HEREBY ORDERED that Defendant Thomas Mathew's

Motion for Summary Judgment (**Instrument No. 36**) is **DENIED**.

The Clerk shall enter this Order and provide a copy to all parties.

SIGNED on this the 26th day of September, 2006, at Houston, Texas.

**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**
